No. 79.—THE BANK OF ST. MARY's, plaintiff in error, *vs.* THE STATE OF GEORGIA, &c. defendant.

[1.] An informer who *commences* a *qui tam* action under a penal Statute, does not acquire thereby a *vested right* to the forfeiture; his claim to the penalty is inchoate only, and cannot be fixed, except by *judgment.*

[2.] No judgment can be rendered on a repealed Statute; the repeal prevents the imperfect right from being consummated; and it is competent for the Legislature to pass such repealing Statute at any time before final judgment; and it matters not whether the whole penalty, when reovered, is given to the public or to the prosecutor, or it is divided between them.

[3.] In civil cases, the Jury are bound to find the law as it is propounded to them by the Court.

[4.] Acts of the Legislature in undoubted collision with the Constitution of the State, or of the United States, are, *ipso facto*, void; and the Courts have the power, and it is their duty, however irksome the performance, to declare them a nullity.

Action on the case, in the nature of a *qui tam* action.  Tried before Judge IVERSON.  November Adjourned Term of Muscogee Superior Court, 1852.

This was an action brought upon the information of Philip A. Clayton, against the Bank of St. Mary's, for the recovery of the penalty imposed by the Act of 1835, for the issuing of change bills, being bills under the denomination of five dollars.  On the trial, the issuing of one hundred and ninety bills of this description, (identified before the Jury,) was proven. A verdict was rendered in favor of the plaintiff, for the half of the penalty affixed by the Statute for the issuing of these several bills, viz: $47,500.  A writ of error was sued out to the rulings and decisions of the Court upon this trial.  The view taken by the Supreme Court, renders it unnecessary to set forth these several decisions; the case turning upon the question whether the Act passed by the Legislature of 1851–2, repealing the Act of 1835, (under which this action was brought,) after suit commenced, but before judgment, relieved the defendant from that portion of the penalty, (viz:

one-half,) which under the Act of 1835, went to the informer. The Court below held that it did not.

Benning and Moses, for plaintiff in error.

B. Hill and C. Williams, for defendant in error.

*By the Court.*—Lumpkin, J. delivering the opinion.

The Act of the Legislature of Georgia, passed December 24th, 1832, to prevent the circulation of bank bills under the denomination of five dollars, within the State, provides—" That from and after the first day of September next, it shall not be lawful for any bank, or body corporate, invested with banking priviliges, or person or persons whomsoever, within the limits of this State, to issue, emit, pay away, pass, or circulate, any bank bill, note, ticket, or paper, purporting to be a bank note, or of the nature, character, or appearance of a bank note, or calculated for circulation as a bank note, either of the Banks of this State, or of any other State, of a less denomination than five dollars. *Provided,* that nothing therein contained, shall be so construed as to make it unlawful for any corporation or person or persons whomsoever, to present for payment, or in any other mode transmit for redemption to any bank, either of this or any other State, any bill or bills of such bank, of the denomination aforesaid, remaining in circulation after the time aforesaid, with a view and in the mode to stop the future circulation thereof." And,

" Any bank or corporate body, or person or persons whomsoever, offending against the provisions of the first section of this Act, shall forfeit the sum of one hundred dollars, to be sued for in the name of the State by any licensed attorney, on the application of any informer cognizant of such offence, who shall be a competent witness on the trial, and recovered by an action of debt, or on the case, in any Court of competent jurisdiction in this State, with full costs ; one-half whereof *when recovered,* shall

be paid to the use of the State, and the other half to the use of the informer." And,

" Each and every issuing, passing away, or circulating of each and every such bank bill or note, as is specified in the first section of this Act, contrary to the spirit, true intent and meaning thereof, shall constitute a new, separate, and distinct offence, and shall be liable to a new, separate, and distinct penalty." *Cobb's New Dig. pp.* 99, 100.

The Statute amendatory of this, approved December 22d, 1835, enacts—" That from and after the passage of the same, it shall not be lawful for any bank or body corporate, or person or persons whomsoever, within the limits of this State, to issue, emit, pay away, pass or circulate any bank bill, note, or ticket, or paper, purporting to be a bank note, or of the nature, character, or appearance of a bank note, or calculated for circulation as a bank note of either of the banks of this State, or of any other State, of a denomination other than of the denomination of five dollars, ten dollars, twenty dollars, fifty dollars, hundreds of dollars, or thousands of dollars." And,

" Any bank, or body corporate, or person or persons whomsoever, offending against the provisions of this Act, shall forfeit for each offence, the sum of $500, to be recovered and applied as provided for by the second section of the Act hereinbefore recited. And that the third section of that Act, shall in like manner apply to and govern in cases provided by this Act." *Cobb's New Digest,* 102.

This action on the case *qui tam*, was brought in the name of the State upon the information of Philip A. Clayton, in the Superior Court of Muscogee County, to recover of the Bank of St. Mary's the penalty for issuing and passing three hundred change bills, contrary to the provisions of the foregoing Acts. On the 23d day of December, 1852, the cause came on to be heard and tried before Judge *Iverson,* when the Jury found for the plaintiff $47,500, with cost of suit.

During the progress of the trial, objections were taken to the declarations, to the evidence, to the refusal of the Court to

478    SUPREME COURT OF GEORGIA.

Bank of St. Mary's vs. The State.

charge as requested by defendant's counsel, and to the charge as given.

We shall examine none of the numerous technical questions spread out upon this record. We should probably affirm the rulings of the Court below on most of them. The only points we propose to consider and decide, are

1. Whether the law under which this penal suit was prosecuted was repealed before the rendition of the judgment? And,

2. If so, does that repeal bar this action?

[1.] It would, in our judgment, be a waste of time to undertake to demonstrate that the Statutes of 1832 and 1835, were repealed by the Act of 1851–2. *Pamphlet Laws, pp.* 25, 26. The Act of 1832, was passed to prevent the circulation of bank bills under the denomination of five dollars; as ones, twos, threes, fours, as well as the fractional parts of a dollar; and imposes a penalty of $100 for every violation of its provisions.

But finding from experience, that the benefits intended to be secured to the currency of the country, were partially frustrated by the emission of bills between the denominations of fives, tens, twenties, fifties, hundreds and thousands, the Act of 1835 was passed to restrict the circulation exclusively to these numbers; and a forfeiture of $500, was inflicted on any bank, corporation, or individual, for each offence against its provisions.

The Act of 1835, enlarges the Act of 1832, by extending the prohibition to *all* but a certain description of bills, as well those above as those below the denomination of five dollars; and makes it more efficient and stringent, by substituting for the penalty of one hundred dollars, a fine of five hundred. The Act of 1835 includes every offence described in the Act of 1832, and creates new ones. Taken together, they prohibit, *in toto,* certainly, the emission or circulation of all change bills whatsoever. Let us turn now, to the repealing Act of 1851–2. It purports by its title, to be "An Act in relation to the issuing of change bills and private banking; for the punishment of the same, and to authorize the banks of this State to issue bills of certain denominations, and for other purposes."

The preamble most truthfully recites, as any one will disco-

ver, who will search through the voluminous mass of legislation which the Code contains upon the subject of "Change Bills, Banks and Banking," that, " *Whereas,* a great number of Acts have been passed by the Legislature on the subject of Change Bills and Private Banking, in which some contain provisions in conflict with others; some expressly repeal others; some impose taxes upon change bills, and thus are claimed to legalize the issue of such bills; and some are obscure and hard to be understood, whereby it has become difficult if not impossible to tell what the law is on the subject, to the great encouragement of such as are disposed to indulge in the practice of private banking; therefore,

"SEC. I. *Be it enacted,*" &c. "That from and after the passage of this Act, no person or body corporate, shall make, issue, pay away, or put in circulation, any bill, or note, check, or other device, calculated or intended as a circulating medium, as money or instead of money, or to serve wholly or in part as money, except such person or body corporate shall have been previously authorized by law to issue the same."

" SEC. II. If any person or body corporate shall violate any of the provisions of the first section of this Act, or shall aid in its violation, they shall be liable to be indicted therefor, and on conviction, shall, for every offence, be punished, in the case of a corporation, by a fine of not less than fifty nor more than five hundred dollars, at the discretion of the Court; and in the case of a natural person, by a fine of not less than fifty and not over five hundred dollars; or by imprisonment in the common jail of the County, for a period not over six months, at the discretion of the Court; but no person who is not concerned in the issue of any such bills or notes, shall be liable to any penalty for paying the same away or putting the same in circulation."

" SEC. III. Whenever the punishment shall be by fine, the proceeds shall be paid, after deducting the expenses of the prosecution, one-half to the informer, and the other to the County Treasury."

" SEC. IV. That the bills, notes, or checks, if paid away, or tendered in payment, contrary to the prohibitions of this Act,

480     SUPREME COURT OF GEORGIA.

Bank of St. Mary's vs. The State.

shall, notwithstanding any thing contained in this Act, be valid and collectable the same as any other note, bill, or check, and shall be subject to taxation at the discretion of the Legislature ; and Acts imposing taxes upon them shall not be considered as legalizing the *making*, issuing, paying away, or tendering in payment such bills, checks, or notes."

" SEC. V. That the Act entitled an Act more effectually to prevent the evils of private banking, and to stop the issuing and circulation of the bills and notes of unchartered banks and private bankers, and the bills and notes usually called change bills, approved December 18th, 1818 ; and *all other Acts respecting change bills or notes, or bills or notes, under the denomination of five dollars, are hereby repealed ; and all the penalties imposed by the same, or by any of them, are hereby remitted.*"

" SEC. VI. That all specie-paying and solvent banks of this State, be and they are hereby authorized to issue small bills of the denomination of one, two, three and four dollars, under the liabilities and restrictions of their respective charters : *Provided*, no bank shall issue an amount of such bills under the denomination of five dollars, above twenty per cent. on the capital stock of said bank actually paid in."

" SEC. VII. That all laws and parts of laws militating against this Act, be and the same are hereby repealed."

Could language be broader ? This Act repeals, by express designation, or words so comprehensive as to embrace necessarily every previous Statute passed by the State upon the subject of change bills and private banking, and substitutes in their place a new Act, covering the whole subject-matter of all the former legislation. It alters, amends, and consolidates the whole. If the paper put in circulation by the defendant were " change bills or notes, or bills or notes, under the denomination of five dollars,"—and such the declaration describes them to be, and such in common parlance, they were, whatever may have been their technical form—and the emission of the same was prohibited by the Acts of 1832 and 1835, or either of them, or any other law, these laws are expressly repealed ; and all the penalties imposed by the same or any of them are hereby remit-

ted. I deem it unnecessary to do more than to bring the law under which this proceeding was instituted and the repealing Statute in juxtaposition, to show that the former is repealed by the latter; and that all pains and penalties previously incurred were expressly remitted.

Indeed, *ex concesso*, not only does the late Act repeal the old law, but it was meant by the Legislature to control this case. This is admitted on the face of the record.

The bill of exceptions states that, as a part of the plaintiff's proof, the notes upon which this *qui tam* action was brought, were read in evidence to the Jury—being ninety in number, of the denomination of fifty cents each, and one hundred of the denomination of twenty-five cents each. According to the testimony, then, the Bank of St. Mary's had issued and circulated one hundred and ninety notes; and estimating the penalty under the Act of 1835, at $500 for each offence, it made the whole forfeiture $95,000. But the verdict was only for half that sum, viz: $47,500. Thus, conceding that the repealing Act applied to the case as made, and that the General Assembly had the power to remit that portion of the fine which would have accrued to the State. The verdict and judgment are for the moiety only, coming to the *informer*—the finding would be manifestly against the uncontradicted evidence as to the number of notes put in circulation, upon any other hypothesis.

[2.] But the main question in this case is, whether any judgment can be rendered in an action founded on a penal Statute, after its repeal?

We are clear, both upon principle and precedent, that a penalty cannot be recovered, after the expiration of the law which imposes it, either by its own limitation, or a repeal by the power which enacted it, without an express provision to that effect, in the repealing Statute; and that it makes no difference whether the penalty, when recovered, goes entirely to the public or to the informer, or whether, as in this case, it is divided between them.

The general position, that where a Statute creating an offence, is repealed by a subsequent Statute, that no punishment can

VOL. XII 61

be inflicted  after the  repeal of the first Statute, is  too well es-
tablished to be  now controverted.   The  doctrine is at least as
old as  *Hawkins and Hale;* and has passed into an axiom in the
science of criminal  jurisprudence.   If it were *res integra,* the
reason of the rule would  be too obvious to  admit of  doubt or
difficulty.   Every one *feels* the  injustice of  punishing a  man
for an  act which the law no longer considers a crime.   Public
policy may forbid that, at one time, which  under other circum-
stances, would not only be  deemed  innocent, but  highly meri-
torious.

To illustrate this  proposition, take the subject of  the curren-
cy itself.   None is more apposite.

All sound-minded men, who  are versed in the science of Po-
litical  Economy, admit the  superiority of  a metallic over a pa-
per medium.   Hence the series of Acts passed  in  this  State
against Change Bills and Private Banking, beginning in  1818,
and running through all the intermediate years, with occasional
interruptions only, down to the present period.   But during the
financial crisis of  1837–8–9, a  general  suspension of specie
payment occurred, not only  in this State,  but throughout  the
Union.   To  borrow the forcible language of  one of the learned
counsel, who argued this cause, the commercial  crisis of  these
years shook the banks " from turret to foundation stone."   The
little specie that had circulated in the community was  soon ab-
sorbed, and silver and gold coin were seen no more.

Would it be seemly, during such an emergency, to be insisting
on the superiority of  hard money, when  it  was  impossible to
supply it to meet the necessities of the times ?   Ought rigorous
penalties to be  enforced against the circulation of  change bills,
when it is the  best  medium of  buying and  selling, barter and
exchange, that could be obtained?   The times change, and the
legislation of a people change with them.   Hence, we find in
our *Digest,* acts of pardon and indemnity for  the  past, and the
Legislature  remitting  all  forfeitures incurred  under existing
laws, in consideration of the  necessity which gave rise to  the
commission of the offence.

It has been well  said that it would not be less absurd to pun-

ish a man for an act which is not illegal at the time the punishment is inflicted, than to punish him for one which never has been declared illegal.

So much for the principle involved in this question.   Upon an examination of the authorities, it will be found that it has been settled, not only in England, but by a series of adjudications, distinct and continuing on in an almost unbroken current, both in the State and Federal Courts of this country.

In 2 *Wendell's Blackstone, pages* 436, 437 and 438, the doctrine upon this subject is thus stated : "A judgment in consequence of some suit or action in a Court of justice, is frequently the means of vesting the right and property of chattel interests in the prevailing party; and here we must be careful to distinguish between property, the *right* of which is before vested in the party, and of which only possession is recovered by suit or action, and property to which a man before had no determinate title or certain claim, but he gains as well the right as the possession by the process and judgment of the law.   Of the former sort are all debts *and choses in action ;* as if a man gives bond for £20, or agrees to buy a horse at a stated sum, or takes up goods of a tradesman upon an implied contract to pay as much as they are reasonably worth ; in all these cases, the right accrues to the creditor, and is completely vested in him, at the time of the bond being sealed, or the contract or agreement made ; and the law only gives him a remedy to recover the possession of that right which already, in justice, belongs to him."

" But there is, also, a species of property to which a man has not any claim or title whatever, till after suit commenced or judgment obtained in a Court of Law ; where the right and remedy do not follow each other, as in common cases, but accrue at one and the same time ; *and where, before judgment had,* no man can say that he has an absolute property, either in possession or in action.   Of this nature are such penalties as are given by particular Statutes to be recovered on an action *popular ;* or in other words, to be recovered by him or them that will sue for the same, such as the penalty of £500, which those persons are, by several Acts of Parliament, made liable to

forfeit, that in being in particular offices or situations in life, neglect to take the oaths to the Government; which penalty is given to him or them that will sue for the same."

" Now, here it is clear that no particular person, A or B, has any right, claim or demand in or upon this penal sum, till after action brought; for he that brings his action and can *bona fide* obtain judgment first, will undoubtedly secure a title to it in exclusion of every body else. He obtains an inchoate, imperfect degree of property, by commencing his suit; but it is not consummated till judgment; for if any collusion appears, he loses the priority he has gained. But otherwise the right so attaches in the first informer, that the *King*, (who, before action brought, may grant a pardon, which shall be a bar to all the world) cannot, after suit commenced, remit anything but his own part of the penalty.

" For by commencing the suit, the informer has made the popular action his own private action, and it is not in the power of the *Crown* or of *anything but Parliament,* to release the informer's interest. This, therefore, is one instance where a suit and *judgment at law* are not only the means of recovering, but also of acquiring property; and what is said of this one penalty, is equally true of all others that are given thus at large to a common informer, or to any person that will sue for the same. They are placed, as it were, in a state of nature, accessible by all the King's subjects, but the acquired right of none of them; open, therefore, to the first occupant, who declares his intention to possess them by bringing his action, *and who carries that intention into execution, by obtaining judgment to recover them.*"

If good taste demands an apology for extracting so copiously from the horn-book of the profession, let it be found in the fact that subsequent adjudications have shed but little additional light upon this full and clear statement of the point under investigation in the text of the commentator.

I will refer to a few, only, of the multitude of reported cases which might be cited in support of the proposition, that where an Act of the Legislature repeals a former Act, imposing a pen-

alty, such penalty cannot be recovered after the repeal of the law by which it is imposed.

Under the Insolvent Debtor's Act, (1 *Geo. III,*) one Miller was compelled, by a creditor, at the *Sessions* at *Guildhall,* to give up his effects, and he accordingly signed and swore to his schedule. But some circumstance arising, the Court adjourned his discharge till the next sessions. In the meantime, the Statute 2 *George III.* passed, which repealed the compelling clause—motion for a *mandamus* to the Justices now to proceed to grant Miller his discharge, the jurisdiction having attached before the clause was repealed. But, by the Court:—Nothing is more clear than that the jurisdiction is now gone ; and that we cannot grant any such *mandamus.* Even offences committed against the clause (while in force) could not have been now punished without a special clause to allow it ; and therefore a clause is inserted in the repealing Statute for that purpose. 1 *W. Blackstone's Rep.* 451.

In *Lewis vs. Foster,* (1 *N. Hamp. Rep.* 61,) a judgment had been rendered for a penalty under a Statute, which gave the *whole* penalty to the *plaintiff.* Under the practice in that State, the original defendant brought his action to review the judgment. Before execution, the section of the law upon which the action was founded, was repealed without any saving clause ; and the Court were of the opinion, that the plaintiff's right of action was taken away, by the repeal of the law on which it was founded. They say it is clear, that if the law had been repealed *before the first judgment,* the plaintiff could not have recovered.

In the *Oriental Bank vs. Freese,* 18 *Maine,* (6 *Shepley,* 109,) it was held, that when a party, by Statute provisions, becomes entitled to recover a judgment in the nature of a penalty, for a sum greater than that which is justly due to him, the right to the amount which may be recovered *does not become vested till after judgment.*

In *The People vs. Livingston,* (6 *Wend. R.* 526,) it is said, it will not be denied that it is competent for the Legislature to repeal any Act upon which suit has been brought, and if the re-

peal is absolute, such suit is at an end. For instance, the present Statutes prohibit gaming, and allow an action to be brought to recover back money won at play; an action is brought and ready for trial; the day before the Circuit, the Legislature repeals the Act; that suit dies, because the Court has no jurisdiction to proceed, and the party has no right to recover the money. Such right did exist, *subject to the contingency of obtaining a judgment,* and such jurisdiction, too, existed; but both have been taken away, because the means of enforcing the right no longer exists. The common repealing clause is so much a matter of course with the Legislature, that the continuance of the suit, and the enforcing of the right seem so much like a Common Law, or, perhaps constitutional right, that we are unwilling to believe that it has been or can be infringed. But it cannot be denied that the Legislature possesses the power to take away, by Statute, what was given by Statute, except vested rights."

What the Court mean by *vested rights,* may be plainly inferred from the decision itself; it is an inchoate right acquired by commencing the suit, and *consummated by judgment ;* for then, and not before, it becomes a *contract ;* for a *judgment is a contract of record.* 2 *Bl. Com.* 465. The obligation of which no State Legislature, under the Constitution, can impair.

In the matter of *Fenelon's and McMaster's Petition,* (7 *Barr.* 173,) the Court say, "the 4th section repeals all former laws inconsistent with the provisions of the said supplement. The proceedings, therefore, on the petition of Fenelon, under former laws, being incomplete and *in fieri,* were arrested, as with the touch of a torpedo, and the Court and those vested with authority in the subject matter, could proceed no further under these laws," citing 11 *Pick.* 350. 1 *N. Hamp.* 61. 3 *Halst.* 48. 17 *Mass.* 240. 7 *Ibid,* 140. "But," continues the Court, "a more decisive case to the same effect, is *Stoever vs. Immell,* (1 *Watts,* 258,) where the Court say, "If the proceedings were imperfect, when the Act under which it was begun, expired, what has been done since is simply void and needs no reversal." And in the same book, "(*Commonwealth vs. Beatty, page* 382,)

where it was ruled, that a remedy having been provided by Statute, and proceedings instituted under it, but during their pendency, the Statute was repealed, the remedy thereby was taken away, and any further proceedings to enforce it, illegal. The proceedings under the old Act, were incomplete at the time; so much of that Act as was inconsistent with the Act of 1847, was superseded and repealed, and they could never have been completed under the old Act of 1836."

The case of *Buckallew against Ackerman,* cited from *Halsted's New Jersey Reports,* is short, but exceedingly strong. A Statute passed in that State, prohibited an act, and imposed a penalty of $10 upon persons committing the same, to be recovered in an action of debt, by any person who would sue for the same. A subsequent Statute made the offence indictable, and the offender liable to a fine of $20. The Supreme Court held, for the reasons expressed in the case of *Perrine vs. Van, note,* (1 *Southard,* 146,) that the Act of February, 1814, repealed by implication the Act of 1797, upon which the action was founded, upon the familiar maxim, that *leges posteriores, priores contrarias abrogant,* and consequently reversed the judgment of the Circuit Court, sustaining the action.

In the *Commonwealth vs. Welch,* (2 *Dana's Rep.* 330,) it was held, that where a penal Statute gives the amount recovered, or a part of it to a prosecutor, his title to it depends upon the *recovery ;* till which he has no vested right that will prevent a repeal of the Statute from discharging an offender.

The Statute of Kentucky, under which this point arose, makes it the official duty of County Attorneys, to prosecute all persons violating the Act, and gives "*half the amount recovered,*" by way of compensation. And the Court of Appeals evidently lay stress upon the peculiar words of the Act. They say, "there is no language vesting an interest before the *recovery* is actually had. *Until judgment rendered,* we perceive no vested interest in the attorney. Hence, there is nothing which prevents the Legislature from controlling the whole matter as it pleases."

The same phraseology is employed, as is seen in the Act of 1832, under which this suit is prosecuted, except that it is much

Bank of St. Mary's *vs.* The State.

stronger.   The Kentucky Statute gives " *half the amount recov-ered.*"   Ours directs, that one half of the penalty, " *when* recovered, shall be *paid* to the use of the informer."

In *Allen vs. Farun*, (2 *Bailey's Rep.* 584,) it was decided, that a *qui tam* action is defeated by the repeal at any time before judgment, of the Statute upon which it was founded.

This was an action of debt, upon the Act of 1777, to recover treble the amount of a sum of money, loaned by the defendant to one Satterwhite, upon an usurious interest.   The first section of the Act prohibits the taking of more than seven *per cent. per annum*, upon loans of money, &c. under the penalty of forfeiting treble the value of the money, &c. so lent; one half to the use of the State, and the other half to him or them that will inform and sue for the same.

In delivering the opinion, the Court say, " the plaintiff's counsel have relied on the ground, that as soon as the offence was committed and proceedings were instituted for the recovery of the penalty, a right vested in the plaintiff, which the Legislature could not take away.   I cannot admit the correctness of the proposition.   The farthest that the argument can be legitimately extended, would be that an inchoate or imperfect interest commenced.   The right itself had not vested, nor do I conceive it could vest, until the money was received.   Up to that time it was under the control of the law.   It is a power delegated by law, as I conceive, to sue for the State and for himself; and the same authority which delegated that power, could revoke it at any time, before its final execution."

I shall adduce but one other precedent from the State Courts, *Pope vs. Lewis*, 4 *Alabama Rep.* 487.   I will not speak of the moral, literary and judicial elevation of the Bench of that State. Suffice it to say, that none has stood more deservedly high throughout the Union.   Mr. Campbell appeared in behalf of the plaintiff in error.   And I will embrace this opportunity to say, that as his own and his father's friend, no one rejoices more at this recent promotion of this son of Georgia.   At the bar, none was distinguished by more uncommon depth of professional learning; his arguments resembling the close, lucid and concentrated

vigor of Coke and Saunders, and the legal Titans of the olden times. Another faithful sentinel has been placed upon the ramparts of the Constitution. May he long live to stay the arm of Legislative, Executive and Judicial encroachment, and enjoy the noblest and highest reward of patriotic and professional ambition !

This was a *qui tam* action, for selling rope and bagging without inspection.

The Court recognize the distinction taken by Judge *Blackstone* in his *Commentaries*, and say, " it cannot admit of a doubt that the Legislature may, at its pleasure, repeal any penal law, and it is equally well settled, that after such repeal, no judgment can be rendered, either of corporal punishment or pecuniary fine." Again—

" It does not militate against the view here taken, that by the commencement of a suit, an informer obtains a right to the penalty against, or rather in preference to one suing subsequently for the same penalty, although the latter may first obtain judgment. It would open a door to fraud and collusion, were it not os, or it would be in the power of the defendant, by omitting to make defence to the last suit, to give the penalty to one who might be in collusion with him, and thus in effect, make the law operate as a penalty upon the party first suing. When therefore, the law gives the right to sue for a penalty, it must in the nature and reason of the thing, be to him who first asserts his right." And again—

" It is also true, as urged, that the *King* cannot, by a release, discharge the offender from that portion of the penalty which goes to the informer, *and this not because he has an absolute vested interest in the penalty before judgment*, but because his right, although inchoate and contingent, is given by *law*, and therefore, not within the control of the *King*. Any control or interference with it, by the executive Magistrate, would be the exercise of the odious power of dispensing with the law ; the portion going to the State, he may release." Still further—

" It is urged, that the repeal of a penal Statute, prevents the

rendition of judgment only in cases where the entire penalty goes to the State.   We think this position untenable." And after referring to a number of cases, in all of which the right of individuals came in question, Judge *Ormond* continues: " Nor is it easy upon principle, to perceive how any other decision could be made.   It has been shown, that this class of rights is inchoate, derived from, and dependant on the Statute which gave them birth.   It is in effect a transfer by the State, to one of its members, of a penalty forfeited to the body politic, and it is difficult to perceive, upon what principle the transferree could enforce it, when the transferrer could not."   Finally—

" It has been strenuously urged, that the true construction of the, repealing Statute is, that it is not to operate on suits actually brought, as that would be to give the repealing Statute a retrospective effect.   The general principle with regard to Statutes undoubtedly is, that they are not by *construction*, to have a retrospective effect, as has been repeatedly held by this Court.   But there is no room for construction here.   The repealing Statute absolutely and without reservation, puts an end to the Act thus repealed ; and as to all penalties and forfeitures created by it, and not ascertained by judgment, it is as if it never existed.   The effect of a reservation or saving in a penal Statute, as to suits commenced under it, is to continue the Statute in force *quoad* such writs.   To hold then, that the unqualified repeal of the Act was no repeal as to this case, would be a palpable act of legislation, under the mask of construction."

With this quotation, the parrallelism between the case in Alabama and that before us is complete, and the decision covers each and all the grounds occupied in the discussion, and answers them most triumphantly.  It concludes by overruling the case of *Taylor vs. Rushing*, (2 *Stewart*, 160,) the only authority adduced in the argument, which, when properly analyzed, is at variance with the doctrine which I have been attempting to establish.

After noticing one decision only from the Circuit Courts, because it is the oldest in the American books, we will turn to a few cases decided in the Supreme Court of the United States, to whose authority, in questions of this nature, we ought to look

up, and be bound by, as the judgment of a Court, not only of the last resort, but one whose learning in every branch of jurisprudence is acknowledged, and whose extent of constitutional research, is certainly unequalled by any Court in any country.

Thomas Passmore was indicted and tried in 1804, in the Circuit Court of the United States, for the Pennsylvania District, under the provisions of the Bankrupt law of 1800, which had been repealed in 1803.   Mr. Dallas, the District Attorney, contended that notwithstanding the repeal of the Act, the defendant might be convicted as for a Common Law offence; and the words " against the form of the Act," he regarded as surplusage. But to this Mr. Justice *Washington* interposed this insuperable objection.   He considered the repealing Act as an absolute bar to the prosecution; and told the Jury expressly, that the defendant was on that ground alone, independent of any question upon the merits, entitled to an acquittal.

The first *Supreme Court* case, is that of *Yeaton and others vs. United States,* 5 *Cranch,* 281.   This was a case in Admiralty, and the circumstance of a judgment having been rendered before the repeal of the law, does not distinguish it from the other cases relied on, when it is recollected, that in this jurisdiction, cases on appeal are to be heard *de novo,* as if no sentence had been passed; and the rule, as taken from the civil law, being, that in cases of appeal, it is lawful to allege what has not before been alleged, and to prove what has not before been proved.   The only question argued was, whether the Court could affirm the sentence of condemnation, inasmuch as the law which created the forfeiture and authorized the condemnation had expired, the Act of Congress making no provision for the recovery, (after the expiration of the Act,) of penalties or forfeitures, which had been incurred under the Act, during its existence.

Counsel for the defendants insisted that in such cases, the law had always been understood to be, that the penalty or forfeiture cannot be enforced, nor the punishment inflicted; that the Court has no longer any jurisdiction in the case.   *Rodney,* the *Attorney General,* on the part of the United States, *did not controvert the principles contended for on the other side.*   And the Court

held, *Ch. J. Marshall* delivering the opinion, that it had long been settled on general principles, that after the expiration or repeal of a law, no penalty can be enforced nor punishment inflicted for violations of the law, committed while it was in force, unless some special provision be made for that purpose by Statute.

*Schooner Rachel vs. The United States,* from 6 *Cranch*, 329, was also an Admiralty case, to which the same observations are applicable. The vessel had been sold and the money paid over; an appeal was taken, and pending the appeal the law expired, and the Court ordered restoration of the property to the owner.

In *The United States vs. Preston,* (3 *Peters,* 57,) the facts were these: The *Josepha Segunda,* with a cargo of negroes on board, was seized for violating the Act of Congress, 2d March, 1807. The seizure took place on the 11th of February, 1818. The vessel was libelled in the District Court of the United States; a decree of condemnation passed; pending the appeal, the negroes were sold with the consent of all the parties to the proceeding; the proceeds, $65,000, were deposited in the registry of the Court, to await the final disposal of the law.

By the 10th section of the Act of the 30th of April, 1818, the first six sections of the former law are repealed, and no provision is made by which the condition of the persons of color found on board a vessel hovering on the coast of the United States, is altered from that in which they were placed under the Act of 1807. The 7th section of the Act of 1818, is directed to cases of illegal importation, and does not comprise a case of condemnation under the 7th section of the Act of 1807.

The final condemnation of the negroes took place in the Supreme Court of the United States, on the 13th of March, 1820, *after* Congress had passed the Act of 3d of March, 1819, " An Act in addition to an Act prohibiting the slave trade," by the provisions of which persons of color brought in under the provisions of any of the Acts prohibiting traffic in slaves, were to be delivered to the President of the United States, to be sent to Africa.

In this case, the proceeds were claimed by the State of Louisiana, one-half for the commanding officer of the capturing ves-

sel, the other half for the treasurer of the Charity Hospital of New Orleans, under an Act of the State of Louisiana, in full force, at the time of the condemnation in the District Court.

Upon this state of facts, the Supreme Court of the United States decided that the final condemnation in that Court took place March 13th, 1820. But the Act of March, 1819, was passed at that time, by which *a new arrangement is made* as to the disposal of persons seized and brought in under any of the Acts prohibiting the traffic in slaves. By the latter Act, they are deliverable to the order of the President, not of the States; and the repealing clause repeals all Acts and parts of Acts repugnant to the provisions of that Act; so that, if in the disposal of persons of color brought into the United States, the provisions of this Act embrace the case of such persons, when brought in under the 7th section of the Act of 1807, the power to deliver them to the order of the several States was taken away, before the *final decree* in this Court. Such, in the opinion of the Court, was the effect of the Act of 1819. And the question which the Court had to determine, was, how did this Act affect the present controversy?

*Mr. Justice Johnson*, delivering the opinion, says: "Ever since the case of *Yeaton vs. The United States*, (5 *Cranch*, 286,) the Court has uniformly acted under the rule there established, to wit, that in Admiralty causes, the decree was not final while it was pending here. And any Statute which governs the case, must be an existing valid Statute at the time of affirming the decree below."

Consequently the claim of the State of Louisiana was overruled, the Court maintaining as it had done uniformly before, that no right *vested* in the informer until *after final* judgment.

The same doctrine is enforced in the recent case of *Norris vs. Crocker et al.* (13 *Howard's U. S. Supreme Court Rep.* 431.) And as this case covers all the points made upon this record to the fullest extent, I felt strongly inclined to rest our judgment upon its authority alone.

It was an action of debt, brought by the owner of a fugitive slave, to recover the penalty of $500, under the Act of 1793,

against the defendants for harboring his slave.   While this suit was pending, the Act of 1850 was passed, known as the Fugitive Slave Law.   Defendant pleaded as a defence, that the Act of 1850, repealed by implication, the Act of 1793, and consequently abated the suit.   The Court held that the Act of 1793 was repealed by implication; and then used this strong language:

"The next question referred to us for decision, presents no difficulty.   The suit was pending below when the Act of September 18, 1850, was passed, and was for the penalty of $500, secured by the 4th section of the Act of 1793.   As the plaintiff's right to recover depended entirely on the Statute, its repeal deprived the Court of jurisdiction over the subject-matter; and in the next place, as the plaintiff had no vested right in the penalty, the Legislature might discharge the defendant by repealing the law.   We therefore answer to the second question certified, that the repeal of the 4th section of the Act of 1793, does bar this action, although pending at the time of the repeal."

*Mr. Hill* suggests that the Court were justified perhaps in holding that the Act of 1850 repealed the Act of 1793, in order to quiet the agitation growing out of the passage of the Fugitive Slave Bill.   How it tended to produce that result is not very apparent.   We apprehend it was made in simple obedience to the law and authority of the case.

This case is stronger than the one at bar, in two particulars. It is a repeal by implication only, on account of the supposed repugnance between the two Acts; whereas, the repeal in the other case is direct and specific.   Again, the action from the Circuit Court of Indiana, was brought by the *owner*, a person having an interest in the property to be protected.   Here it is instituted by one possessing no claim or title whatever, until after suit commenced and judgment obtained.

We fully and unanimously concur then, in the following conclusions: that the authorities cited, abundantly sustain the position, that an informer who *commences* suit under a penal Statute, does not acquire thereby a *vested right;* that his claim to the pen-

alty, at most, is inchoate only, and cannot be fixed or *vested*, except by judgment; that no judgment ran be rendered on a repealed Statute; that the repeal of the Statute prevents the imperfect right from being consummated or from becoming a vested right or contract; and that it is perfectly within the legislative competency to pass such repealing Statutes before *final judgment.*

[3.] It only remains to notice two positions occupied by the counsel for the plaintiff in error, for the purpose of overruling them; and the first is, that in *all* cases, *civil* and *criminal*, the Jury are the judges of the *law* as well as the *evidence.*

One of the errors assigned in the leading case of *Thornton vs. Lane*, (11 *Geo. R.* 459,) was that the Court charged the Jury that they were " bound to regard the law as stated by the Court, to be the law of the case." In commenting upon this exception, this Court said:

" It will be admitted by all who have read our Reports, that no Court in this country has gone farther than we have, to see to it, that the Judge did not invade the province of the Jury. Even where verdicts have been manifestly against the weight of evidence, still we would not suffer them to be disturbed, unless they evinced by their gross injustice, passion, partiality or prejudice. We believe that the law conferred upon them this power; that to the Jury, as a favorite and almost sacred tribunal, was committed exclusively, the task of examining the testimony and passing upon the merits of the case, according to their opinion of the facts and circumstances; that we were bound to presume in favor of the purity of their motives; and that it was not until the result of their deliberations were such as to shock both the understanding and the moral sense, that the Courts were at liberty to interpose and control their verdicts. *Beyond this we will not go.*"

." For while we have always respected and secured to the Jury to the fullest extent, the right to decide upon the facts, we will take equal care that the rights of the Court to decide the *law* shall never be impaired or questioned by the Jury. Establish a contrary rule, and there is no longer any certainty in the

law.    The peace of the country, the security of life, liberty and property, are undermined and destroyed.    A state of things which every good man should deprecate."

Subsequent reflection has produced no change in the opinion here expressed.

The learned counsel, to sustain the contrary doctrine, goes back to the first Constitution of Georgia, in 1777, which not only declares that "the Jury shall be judges of the law, as well as of the fact;" but further, that "trial by Jury shall remain inviolate forever."    The very section which he cites, however, contains the further clause, that if all or any of the Jury have doubts concerning points of *law*, they shall apply to the *Bench*, who shall, each of them in rotation, give their opinion.    Moreover, the latter article in that instrument to which he refers, does not declare, as is provided by the Constitution of 1798, that trial by Jury "*as heretofore used in this State*," or as is thereby established, shall remain inviolate ; but simply that *trial by Jury* shall not be abolished.    *Watkins' Dig.* 7.

But suppose the Constitution of 1777 did say, that the trial by Jury, as *therein* established, or as *theretofore* practised, should remain inviolate forever, (which it does not,) the restriction would not be binding upon the Conventions of 1786 and 1798. The delegates to these bodies, representing the will of the sovereign people, formed *new Constitutions* for the government of the State; in which, and the subsequent Statutes passed in pursuance thereof, the jurisdiction between the two departments of the Court, the Judge and the Jury, is accurately defined and distributed, and the boundary line between the power and province of the two, established as it existed at Common Law. And the distinction is, that in civil suits, the opinion of the Court *can* and always *ought* to be ultimately enforced; but that in criminal cases, it is most consistent with the permanent security of the citizen, that the Jury should, after receiving the advice and assistance of the Judge as to the law, take into their consideration all the circumstances of the case, and the intention with which the act was done, and determine upon the whole, whether it be, or be not, within the meaning of the law.    This

distribution of power, by which the Court and Jury mutually assist and mutually check each other, seems to be the safest, wisest and best arrangement.

In England, the only contest which ever agitated their Courts, was whether the *maxim* that *ad quæstionem legis respondent judices, ad questionem facti respondent juratores*, excluded the Juries from being judges of the *law* in *criminal* cases. On the trial of *Lilburne*, for high treason, in 1549, (2 *St. Tr.* 69, 81, 82,) this question arose for the first time between the jurisdiction of the Court and the Jury ; and the Court in this, as in *Algernon Sydney's*, and many subsequent cases, promptly repudiated the doctrine insisted upon by the defendant, that the Jury in *criminal* cases were the judges of the *law* and fact. Indeed numerous authorities may be found in the Courts of this country, to the effect, that Juries are bound, even in *criminal* cases, to find the law as it is propounded to them by the Court, and if they find contrary to the instructions of the Court, they violate their oaths. See the elaborate opinion of the Court in *Townsend vs. The State*, 2 *Blackford's Rep.* 151.

But that in *civil* cases, the Court are the exclusive judges of the *law*, was never doubted in *Westminster Hall*. And for myself, I look with regret, at the repeated efforts made in modern times, here and elsewhere, to take away from the Bench, this corner-stone of jurisprudence. The time-honored doctrines, that a Judge must not only be impartial, *but that he must pay a blind obedience to the law, whether good or bad;* that he is bound to declare what the law is, and not to make it; that he is not an arbitrator, but an interpreter of the law; that it his duty to be patient in the investigation of the case—learned in considering it, and firm in his judgment ; that he ought, according to Cicero, in his oration for Cluentius, never to lose sight of the fact, that he cannot exceed the power given him by his commission ; and that he ought always seriously to attend, not to *his wishes*, but to the *requisitions of the law;* I repeat, these old-fashioned notions are considered too straight and too narrow for this age of "higher-law." The *Judge* must be stripped of the ermine, and the attempt is making to transfer it to the

shoulders of the *Jury ;* to dethrone the *Law*, and to substitute in its place the *stet pro lege voluntas* principle. Ill-fated would it be for our country, if this doctrine was to prevail. I claim to be the staunch advocate of *reform.* But I reprobate *progress*, in this direction. It is *re*-gress. It is not progress onward and upward, but progress with a fearful proclivity downward.

Prostrate the Judiciary, viz: divest it of all legal and constitutional control and jurisdiction, and concentrate all power in the jury-box, you convert at once the temple of justice into a gladiatorial arena. Liberty will be no more, and property but a shadow. The ministry of the unsanctified sons of Aaron, scarcely produced a flame more sudden, more violent, or more destructive, than such a judicial revolution would inevitably occasion.

[4.] The other proposition is, that the Judiciary have no power to declare any legislative Act void.

In *Beall, administratrix, vs. Beall & Beall,* (8 *Geo. Rep.* 210,) and in numerous other cases, this Court held that it was both the right and duty of *all* Courts to declare *all* legislative Acts void, which plainly and palpably violate the Constitution. Upon this subject we have never entertained but one opinion, which has been strengthened by reflection, and fortified by the concurring sentiments of the Supreme Court of the United States, as well as of lawyers, Judges and Statesmen of the highest standing in all parts of the *United States of America.* 2 *Peters,* 522. 12 *Wheaton,* 270. 3 *Dallas,* 386. 2 *Ib.* 309. 4 *Ib.* 18. 6 *Cranch,* 128. *Charlton,* 175. *Ib.* 235. *Walker,* 146. 1 *Black.* 206. 1 *Breese,* 209. 1 *Ib.* 70. 2 *Porter,* 303. 1 *Marsh.* 290. 2 *Litt.* 90. *Pr. Dec.* 64. *Ib.* 89. 4 *Monr.* 43. 5 *Hayw.* 271. *Cooke,* 217. 4 *Yerg.* 202. 9 *Ib.* 490. 1 *Rep. Con.* 61, 267. 3 *DeSaus.* 476. 1 *McCord,* 238. *Harper,* 385. 1 *Hayw.* 28. 1 *Car. Law Rep.* 246. 1 *Murph.* 58. 6 *Rand.* 245. 1 *Virg. Ca.* 20. 1 *Binn.* 419. 5 *Ib.* 355. 2 *Yeates,* 493. 2 *Pennsyl.* 184. 3 *S. & R.* 169. 19 *Johns.* 58. 1 *Cowen,* 550. 1 *South.* 192. 2 *Ib.* 466. 1 *Har. & J.* 236. 7 *Gill. & Johns.* 7. 1 *Ib.* 463. 10 *Con.* 522. 4 *Ib.* 225. 3 *Vermont,* 507. 1 *Ohip.* 257. 1 *Ib.* 237. 1 *Aik.* 314. 3 *N. Hamp.* 473. 4 *Ib.* 16:

Bank of St. Mary's *vs.* The State.

7 *Ib.* 65, 66.   6 *Greenl.* 412.   6 *Ib.* 112.   3 *Ib.* 326.   4 *Ibid,* 160.   2 *Fairf.* 118.   9 *Greenl.* 60.   11 *Mass.* 396.   13 *Pick.* 60.   15 *Mass.* 447.   7 *Pick.* 466.   9 *Barr.* 108.   5 *Humph.* 165.   3 *Harr.* 441.   2 *Speers.* 761.   3 *Brevard,* 533.   1 *Howard Miss.* 102.   5 *Pike,* 709.   4 *Miss.* 50.   4 *Ib.* 120.  3 *Scam.* 238.   *See Papers in the Federalist, on the subject of the Judiciary,* which are equal, if not superior to any to be found in that publication.    The remarks of Professor *Tucker,* in his notes to *Blackstone,* upon this subject, *part I. vol.* 1, *Appendix, pp.* 354, 355, are worthy of the most careful consideration, and are hoary alike in *wisdom* and in age.

In opposition to the principle, that if an Act of the Assembly be a manifest breach of the Constitution of the State, or of the United States, it is not only the right, but the duty of the Courts to pronounce such an Act to be void, stands "solitary and alone," the *dissenting* opinion of Mr. Justice *Gibson,* in the case of *Eakin and others vs. Raub and others,* 12 *Serg. & Rawle's Rep.* 330.   The views of this distinguished Judge are ingenious, I admit; but however much I may esteem his great learning and respect his judicial opinions, I cannot adopt his conclusions, in opposition to a principle so well established—one than which, to borrow the language of his colleague, "none is more conducive to personal liberty and security of property—none of which the people of this free country can more justly boast—none which so pre-eminently distinguishes our *American* Constitutions over every other country and government—than the doctrine which has prevailed since their formation, in the Courts of all these States, from Maine to Georgia, that the people possess the sovereign right to limit their law-givers, and that Acts contrary to the Constitution are not binding as laws.   The concurrence of statesmen, legislators and jurists, uniting in the same construction of the Constitution, may insure confidence in that construction"—(citing) *Cole vs. Virginia,* 6 *Wheaton,* 401.

Indeed, either upon the rule of *stare decisis,* or as the result of his "sober second thought," this eminent Magistrate, who still lives, to adorn the highest judicial tribunal of his State, has sanctioned the principle that an Act of the Legislature, clearly re-

pugnant to the Constitution, is *abso facto*, a nullity, and the Courts have the power, and it is their duty to declare it.*   *Parker vs. Commonwealth*, 6 *Barr*. 507.   *Dale vs. Medcalf*, 9 *Barr*. 108.   In both of these cases, Acts of the Legislature of Pennsylvania were declared to be *unconstitutional* and void.   The same Judges presided in both; and in the first, Chief Justice *Gibson* gave the casting vote against the validity of the Act.

Under these circumstances, may we not hope that this is the last time that counsel will desire to be heard upon these points in this Court?

Judgment reversed.

[3.] Applications for new trials, on the ground of newly discovered evidence, are not favored by the Courts; but when the affidavit of the witness is produced, stating what he will swear, and it is shown that the knowledge of the newly discovered evidence, was acquired by the party app·ying, since the trial; that it was not owing to the want of due diligence that he did not obtain it sooner; that it is not cumulative only, and that it is material, and might probably produce a different verdict, a new trial will be granted.

---

*Since this opinion was delivered to the Reporter, the distinguished Judge has departed this life—Rep.