Lumpkin, J.
dissenting.
On the 30th day of December, 1836, the Legislature incorporated a banking company, under the name of the Planters and Mechanics Bank of Columbus. Certain persons named in the charter, with all such as might thereafter become stockholders, were made and declared to be a body politic, by the name and style aforesaid. And it was provided amongst other things, that said corporation or company should continue until the first day of January, 1857. Prince, 124-5.
*97 Suit having been prosecuted to insolvency at the instance of the billholders against the corporate assets, actions were brought against the stockholders under the 11th section of the charter, to make them personally liable for the redemption of the outstanding circulation. This is one of the cases. And it is now contended, in behalf of the stockholders, that these suits must abate as to them, inasmuch as the charter has expired by its own limitation; and with it, all rights or remedies founded upon or growing out of it.
This proposition, or the principle at least involved in it, is not new in this Court. In the case of Moultrie and others against Smiley and Neal, 16 Ga. Rep. 289, the same question was made, and argued with a degree of learning and ability proportionate to its importance, and worthy of the high reputation of the eminent counsel engaged in the discussion. And after mature deliberation, this Court held, that an action brought against the directors of the Commercial Bank of Macon, to make them individually chargeable, under the personal liability clause of that charter, did not abate by the expiration of the charter, during the pendency and before the termination of the suit.
My opinion in that case occupies near forty pages of the Reports. To that, and to the concurring opinion of my brother Starnes, I refer, and reaffirm and adopt the same, (I will not re-write the argument,) without doubt or hesitation; but at the same time, with all the diffidence which the contrary judgment of my colleagues, and the magnitude of the interests involved, cannot fail to inspire. I am fully persuaded that the law, rightly interpreted, never was intended to work such gross and palpable injustice as the sanction of the doctrine, set up to screen this defendant, would establish. That this or any other bank may go on issuing bills and accumulating profits, by any and every means known to and practiced by moneyed institutions, till the day before their charter, expires — the set time for which is known to nobody, or but very few — and while they hold on to all the gaifis they ac *98 quire, escape responsibility to redeem the currency with which they have flooded the country, so shocks, at first blush, the moral sense of any man, that to give such a construction to the Act of the Legislature, it should be written in sunbeams.
To my mind there is no obscurity in the charter oí this bank. To me it has been the guiding star through all the labyrinths of the multiplied, novel, and subtle discussions which have originated under it, within the last eight years. What saith the charter ? has been my constant and invariable enquiry. And to my humble understanding, it has never spoken but one language — the same that was announced first by this Court in Lane vs. Morris, 8 Ga. Rep. 476, in 1850, and which has been reiterated in every subsequent decision: and that is, that the right of the billholder; under the llth section of the charter, to hold the person and property of the stockholders pledged and bound for the ultimate redemption of the bills of the bank, in proportion to the amount of his shares, and the value thereof, is one which he may assert in his own name, before or after the dissolution of the corporation ; one which is wholly above and beyond the reach or control of any future legislation; and that this is a supplemental or superadded security for the benefit of the billholder. An able writer in one of the public gazettes insists, that the llth section of this charter has “ cut up by the roots all the common law nonsense, as to the dissolution working an extinguishment of all the debts of a corporation;” and contends, that it constitues the stockholders simply partners. And he remarks, that it is a legal novelty to hold, that upon a dissolution of a copartnership, its debts are thereby extinguished. In support of his position, he cites Angel and Ames on Corporations, pp. 478, 486, 493; 17 Mass. Rep. 334; 2 Wendell, 269 ; 2 Hill’s N. Y. Rep. 269 ; and 2 Kent’s Commentaries 316, where the Chancellor comments without disapproval of the case of Slee and Broom, where the Supreme Court and Court of Errors of New York held, that such' corporations were mere copartnerships. And that regard to the *99 interests of the community required that individuals, whose property thus put into a common mass enabled them to obtain credit generally, should not shelter themselves from a responsibility to rvhich they would be held liable as members of a private association.
And I will take leave to add, that this individual liability clause, in modern charters, must it seems to me, go far to modify much of the old common law upon the subject of corporations. That the corporators, thus made personally responsible, should stand in the same relation to creditors as the individuals who compose a simple copartnership, is most obviously just.
This same writer utterly, and very properly, repudiates the idea that the stockholders are sureties, merely, in the restricted and legal acceptation of that term; and with it, the deduction that the discharge of the principal — the bank — .is a discharge of the sureties — the stockholders. He says, and says truly, that when the stockholders are spoken of as sureties, guarantors, &c., it is a more convenient phrase to signify their ultimate liability. As well, he insists, may the members of common copartnerships, be called sureties, for they are not individually liable, till the partnership funds are exhausted.
“ What,” he asks, “is an incorporated bank separate and distinct from the stockholders ? Is it not a myth, a shadow, a figment of the brain? Has it flesh, or bones, or blood? No; but it has assets and tangible property. Was it not the stockholders, through their agents, the President, Directors and Cashier, who procured these assets and this tangible property ? And if these assets are missing or appropriated^ do they not disappear through the same agency ? Do not the stockholders claim these assets as their property ? Are not all contracts made with the bank, made for the benefit of the stockholders ? How absurd then to talk about stockholders being sureties for their bank !”
Chief Justice Bronson, anticipating that some honest *100 Judge might get confused with this term sureties applied to stockholders, kindly admonishes him in this wise, in pronouncing the opinion of the Supreme Court, in Harper vs. McCulloch, 3 Denio’s Rep. 123; “I think the stockholders, in their individual as well as their corporate capacity, are principal debtors. Although they have been incorporated with many of the privileges usually granted to men associated in that form, yet the privilege of exemption from personal liability for the debts of the company, has been denied to them, and their personal liability has been expressly declared. They are thus placed in relation to the creditors of the company, upon the same footing as though they were an unincorporated association or partnership. In one respect the burden is made more onerous than it would have been in going on without a charter; for the copartners are severally as well as jointly liable. But that does not affect theprinciple; nor is it affected by another provision, that lightens the burthens, by saving the stockholders from an action, until the creditors have attempted to collect the money from the corporation by proceeding to a judgment and execution. The stockholders are debtors from the beginning, although the creditor has no remedy aagainst them, until he has first tried to collect from the company. This is no more than applying an equitable principle, which requires that the debts should be paid from the joint funds of the associates, rather than from the separate property of any of them. I think the defendant was answerable to the plaintiff, as a principal debtor; and consequently, that he was not discharged by giving time to the company, which he would have been, if the individual corporators are to be considered in all respects as sureties.”
But it is said, that this being a statutory right, does not survive the statute. That by the charier, the bank is first liable for the payment of the bills; and that upon the failure of the bank, the stockholders are secondarily liable, under the 11th section of the charter. And it is earnestly asked, "Can *101 it be imagined by the human mind, that the contract by the bank to pay, in the first place, is less strong, less obligatory, or less durable, than the contract with the stockholders?”
All I have to say, in answer to this position, so triumphantly assumed, is, that, in addition to the utter confusion of ideas, not to say sophistry, of endeavoring to separate the bank from the stockholders throughout this litigation — a notion so entirely demolished in the foregoing citations — I have attempted to demonstrate in Moultrie et al. vs. Smiley and Neal, and succeeded to my own satisfaction at least, that the debt,as against the bank itself, is said to be extinguished, not by any implied condition in the contract, but from necessity, because there was no person against whom it could be legally enforced. It was the reason assigned for the rule, in the Bishop of Rochester’s case, decided in the 38th of Queen Elizabeth — the earliest reported case upon the subject. It has been recognized and repeated in all the subsequent adjudications, from that day to this. And neither counsel, with all their vehement declamation, have been able to overthrow it; nor learned Judges, with all their research, to furnish any other.
If this be so, the interrogatories, so indignantly propounded, are pointless. For,'although you are unable to sue a party primarily liable, because he is dead and has no representative, that is no reason why theremedy of the bil[holders should not be enforced against another party secondarily liable; and that too, whether he be a surety proper, only, or not. And especially in a case like this, where the bank and the stockholders are, in reality, one and the same, and as indivisible as the Siamese twins.
Whose fault is it but the stockholders, that their bank charter was dissolved, by judgment of forfeiture, in June, 1843 ? What peculiar indulgence have they upon the Courts and the country ?. They failed to discharge their obligations to the public ; and for this default, after great forbearance, the Legislature directed their franchise to be revoked.
*102 But this defense, which affects such a sense of outraged justice, is the more surprising, when it is recollected that the principle contended for, does not, and never did apply to the stockholders of this corporation. In this very case, .there is a valid and subsisting judgment against the bank; and one capable of enforcement against the corporate assets, could any be found. The real estate belonging to this company, if it ever had any, never did revert to the grantor; its personal property never was seized by the State; nor was this antiquated rule of the common law ever applied in Georgia, against this or any other corporation. What has become of the large amount of available assets which belonged to this corporation — it is not necessary or proper to examine into hero. Suffice it to say, the State never clutched them; and it is not pretended, that the creditors did.
But it is urged that the Bank of St. Marys vs. The State, 12 Ga. Rep. 475, decides this case. If I am capable of comprehending the simplest doctrines of the law, there is not the remotest analogy between Winter’s case and this.
The Act of 1832 imposed a penalty of $100 for issuing or passing a change bill; to be recovered by suit; one-half ivhcn recovered, to be for the use of the State, and the other half to go to the informer. In 1851-2, before final judgment was rendered against the bank, the Act creating the offence and fixing the penalty,' was expressly repealed. And this Court held, and rightly, and the informer has acquiesced in it, by failing to prosecute a writ of error to the Supreme Court of the United States to reverse the judgment, as he threatened, and was encouraged by the Court to do; that no judgment could be awarded on the repealed statute ; that the repeal prevented the imperfect right from being consummated; that it was competent for the Legislature at any time to pas's such repealing act before final judgment; and that it mattered not, whether the whole penalty when recovered, is given to the public or to the prosecutor, or is divided between them.
*103 I trust this case, and the reasoning upon which the judgment of the Court rests, will be read; and the utter dissimilarity between that case and this, will be perceived at a glance. What vested right had P. A. Clayton, the informer, in the penalty annexed to a violation of the Act of 1832 ? None whatever, until reduced to final judgment. It belonged as of common right, to any citizen of the State, to institute this quilam action, or prosecution. What consideration did Clayton pay for it? How different the billholder’s condition. In the performance of his part of the undertaking with the stockholders of this bank, and relying upon their promise and pledge in the 11th section, to redeem the bills of their bank, if it did not, he took them for his property — his cotton —his slave — his horse. And I assert it confidently, it is not in the power of the Legislature to release them from their obligation.
In the case before us there was, in point of fact, no charter to expire by lapse of time. The charter had been terminated by a judgment of forfeiture, more than thirteen years previously; and notwithstanding this case went off upon this ground of the expiration of the charter. I cannot see how it could arise. One of the modes of dissolving a corporation is by forfeiture of its charter for an abuse of its fran? chises, by a judgment of a Court of Law. 2 Kent’s Com. 305; 1 Black. Com. 485; Angell & Ames on Corporations, 648, 2d edition ; 16 Maine Rep. 224, 314. Now, the Act of incorporation granted to this company in 1836, having been solemnly vacated and annulled in 1843, how it survived, to die a natural death in 1857, 1 do not understand.
I have neither the original bill of exceptions, nor a copy, nor the Reporter’s statement of the facts, before me, to enlighten me concerning this matter. Notwithstanding the dissolution in 1843, this Court has uniformly held, from the first cases in 8 Ga. Rep’s, 468, 486, down to the case of Adkins vs. Thornton 18 Ga. Rep’s, 325, that the stockholders were liable for the ultimate redemption of the outstanding *104 circulation. How could it hold otherwise, under the Acts of 1842 and 1843? Cobb’s Dig. 118 and 1820, as expounded by this Court, in Robinson vs. Lane, 19 Ga. Rep. 337. And if all this1 be so, what was there to expire in January, 1857? Were not the rights of the creditors, and the liabilities of the stockholders, fixed and determinable by the action of the Legislature and the Court, in 1842 and 1843 ? But concede that this point is legitimately presented. The Legislature grant a bank charter to a company, by accepting which they stipulate with all whom it may concern, that if you will take our bills, we bind ourselves individually to redeem them, provided the bank does not. Under .this agreement, bills are emitted, circulated, and received, if you please, until the 1st day of January, 1857, when the stockholders insist the understanding is no longer binding. Very well, say the bill-holders, fulfill your contract for the past, by redeeming the bills which you have heretofore issued, and which we have taken as a part of the circulating medium of the country, in the due course of trade and business. No, we will not, respond the stockholders; our charter has run out by eflux of time! and, hence the obligation is no longer enforcible. To state the case, is to carry conviction to the conscience and bosom of all men. What if the capacity to contract cannot extend beyond the period limited by law? Does that interfere with what has already been done ? Is it in the power of the Legislature to impair the obligation, already incurred, to redeem their bills ? The Supreme Court of the United States, from intimations of approval already given, respecting the past decisions of this Court respecting these bank cases, would not hesitate, I feel well assured, in declaring any such attempt unconstitutional and void.
But the Legislature has been guilty of no such folly. On the contrary, by the successive Acts of 1841-42-43, it has kept alive the corporate liability itself, so far at least, as to preserve the assets for. the purpose of discharging the liabilities incurred. And if it be maintained that the old common *105 law rule of extinguishment of debts, is not founded upon the reason which I have assigned, and that is, that there is no one to sue or be sued, but upon a different principle, namely: that as the defunct corporation cannot collect the debts owing to it, that it is but equitable that it should be relieved from the payment of those which it owes; then I reply emphatically, that that reason does not exist here.; for by the Acts te which I have referred, and the constitutionality of which has been uniformly affirmed by this Court, up to the present time, ample provision was made for securing and collecting the assets of this bank. 19 Ga. Rep. 337. And if any debtor of the bank has escaped upon the ground, that his liability was extinguished, either by the dissolution in 1843, or the expiration .in January, 1857, it has never been brought to the knowledge of this Court. On the contrary, it has been again and again distinctly proclaimed, in the discussion of these bank cases, that the assignee suffered the debts to be wasted and lost, because he did not see fit, for reasons satisfactory to himself, to enforce their payment.
The principle, then, upon which the common law rule is upheld on the other side, having no foundation to stand on, in point of fact, in this case, the rule itself should not be administered.
But in addition to the Acts of 1840-41-42-43, which apply directly to the Planters and Mechanics Bank of Columbus, the Legislature, during the session of 1855-56, (Pamphlet Acts, 226,) passed a general law repealing, in express words, this rule of the ancientcommon law, and making specific provision for the collection of the assets of a defunct corporation. It was competent for the State to do this, evefl as it respects existing corporations: to declare that it would not seize and appropriate their property, either upon the forfeiture or expiration of their charters, but would provide for the appointment of a trustee to administer their effects, and apply the proceeds first t© the payment of debts, and next to the distribution of the surplus amongst the stockholders. *106 Thus cutting up by the root all pretense on the part of the stockholders of this or any other corporation, to escape their individual liability; because, as has been urged, it would be unjust to hold them responsible, when the corporate assets could not bo made available, which were primarily chargeable. This strikes from beneath them their last plank.
It has been intimated, that the omission of the Legislature to save the stockholders’ liability by this statute, is significant of their intention not to do so. ■ For myself, I have held from the beginning, that the security given under the 11th section of the charter, to the billholders of this bank, was beyond the reach and control of the Legislature. It was a statutory contract, which ran on for twenty years from the time the right of action accrued; and so the same Legislature has declared in accordance with the law and the decisions of this Court. (Pamphlet Acts, 233.) And hence the General Assembly would not be guilty of an act of supererogation, by enacting that which existed to the fullest extent already, ©ven if they were clothed with the constitutional competency to do so. But I forbear.
So numerous have been the adjudications already, upon these vexed and vexing bank questions, that it has become a matter of serious labor, as well as of embarrassment, to review them. The task would occupy a volume. I have tried faithfully, and to the best of my poor ability, to hold the scales in just equipoise, throughout this exciting and vexatious litigation. On the one hand giving to the charter that exposition which would effectuate the end for which it was granted, to-wit: security to billholders and to the public, and thereby, protection against an irredeemable paper currency. And on the other hand, shielding the members of this carporatiou against all suits or actions, at the instance of those who shared, or participated in any way, in the illegal, not to say fraudulent proceedings, which, were had preparatory to the organization of this bank. Under the salutary doctrines which wore enunciated in the case of McDou *107 gald, adm'x, vs. Bellamy, adm'r, &c., 18 Ga. Rep’s, 411, and to which I invite special attention, the outstanding liabilities of these stockholders have been reduced from between $220,-000 and $230,000, to between $40,000 and $50,000!
Satisfied in having been fully sustained by the Legislature, as its records will show, in every important principle, which I have ruled in these cases, from the beginning down to the present time; a just reverence for what I believe to be the law, and a conscientious desire to discharge my duty, impose upon me the necessity of dissenting from the judgment rendered by a majority of the Court in this case.